UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————

JORDAN CROWLEY,                                    1:21-CV-01078 LJV (MJR)

                                                   REPORT, RECOMMENDATION
                                                   AND ORDER

                        Plaintiff,

        v.


STRONG MEMORIAL HOSPITAL OF
THE UNIVERSITY OF ROCHESTER;
KALEIDA HEALTH; and UBMD
PHYSICIANS' GROUP,

                        Defendants.

———————————————


        This case has been referred to the undersigned pursuant to Section 636(b)(1) of

Title 28 of the United States Code, by the Honorable Lawrence J. Vilardo. (Dkt. No. 67)

Before the Court are defendants Strong Memorial Hospital of the University of Rochester

and Kaleida Health's motions to dismiss the putative class action claims for injunctive

relief from the amended complaint. (Dkt. Nos. 115, 116) Also before the Court is plaintiff

Jordan Crowley's motion for discovery. (Dkt. No. 128) For the following reasons, it is

recommended that Strong Memorial Hospital of the University of Rochester's motion to

dismiss the putative class action claims for injunctive relief be denied; it is recommended

that Kaleida Health's motion to dismiss the putative class action claims for injunctive relief

be granted; and it is ordered that Crowley's motion for discovery is granted in part and

denied in part.

## PROCEDURAL HISTORY

Plaintiff Jordan Crowley ("Crowley" or "plaintiff") filed his initial complaint on October 1, 2021, alleging race-based discrimination with regard to his medical care by Strong Memorial Hospital of the University of Rochester ("Strong"), Kaleida Health ("Kaleida"), and University at Buffalo Pediatric Associates, Inc. ("UBMD Pediatrics"), in violation of Title VI of the Civil Rights Act of 1964; the Patient Protection and Affordable Care Act; and the New York State Human Rights Law. (Dkt. No. 1) Plaintiff challenged defendants' use of a race-adjusted eGFR (Estimated Glomerular Filtration Rate) score to assess his kidney function for purposes of determining eligibility for a kidney transplant. (*Id.*) Plaintiff also alleged breach of contract based on defendants' respective Patient's Bills of Rights, which prohibit race-based discrimination in the provision of medical care and treatment. (*Id.*)

Plaintiff filed a motion to amend the complaint on October 12, 2023, seeking to add putative class action claims against Kaleida and Strong.[1] (Dkt. No. 65) Specifically, he sought to add class claims for both compensatory damages and injunctive relief against Strong, as well as a class claim for injunctive relief only against Kaleida. (*Id.*) This Court granted plaintiff's motion to amend the complaint to add the putative class claims (Dkt. No. 112), but cautioned that without the addition of "fact-based and non-speculative allegations as to how plaintiff continues to be adversely affected" by the actions of Strong and Kaleida with regard to the assessment or use of eGRF scores and/or the collection of racial or ethnic data, the individual and class-wide injunctive claims in the proposed amended complaint may be subject to dismissal. (*Id.* at pgs. 30-31, 34-35)

---

[1] Plaintiff did not seek to add any putative class action claims against UBMD Pediatrics.

On October 11, 2024, Plaintiff filed the amended class action complaint ("AC"), the operative pleading here. (Dkt. No. 113) The AC contains additional allegations, not previously alleged in the proposed amended complaint, related to plaintiff's standing with regard to his claims for injunctive relief against Strong and Kaleida. (*Id.*)

On November 1, 2024, both Strong and Kaleida (collectively referred to as "defendants") moved to partially dismiss the AC for lack of subject matter jurisdiction.[2] (Dkt. Nos. 115, 116) Defendants contend that plaintiff lacks standing as to his individual and putative class claims for injunctive relief, and that his requests for injunctive relief are moot. (*Id.*) Plaintiff filed a response in opposition (Dkt. No. 125) and defendants replied (Dkt. Nos. 126, 127). Plaintiff also filed a motion for discovery on January 24, 2025. (Dkt. No. 128) The Court heard oral argument on February 4, 2025.[3] (Dkt. No. 131)

## THE AMENDED COMPLAINT

### *The eGFR and Measurement of Kidney Function*

The kidney filters waste and excess fluid from the body. (Dkt. No. 113, ¶ 3) Kidney health may be assessed by measuring an individual's Glomerular Filtration Rate ("GFR"). (*Id.* at ¶ 4) An individual with a healthy kidney usually has a GFR between 90 and 120, while individuals with lower GFR scores typically experience lower kidney function. (*Id.*)

---

[2] UBMD Pediatrics filed an answer to the AC on November 1, 2024. (Dkt. No. 117)
[3] As noted previously, in addition to the injunctive relief claims that are at issue here, the AC also asserts claims for compensatory damages on behalf of plaintiff and the putative class against Strong, as well as a claim for compensatory damages on behalf of plaintiff only against Kaleida. (Dkt. No. 113, ¶¶ 60-61, ¶ 74, pgs. 25-30) (alleging violations of Title VI, the Patient Protection and Affordable Care Act, and the New York State Human Rights Law against all defendants by plaintiff individually and by the putative class against Strong and Kaleida, and seeking compensatory damages for both plaintiff and the putative class as to each claim). Plaintiff also seeks compensatory damages against all defendants as to his individual claim for breach of contract. (*Id.* at pgs. 28-29) Defendants have not moved to dismiss the individual or class claims for damages. Thus, plaintiff's individual and putative class claims against Strong for damages, as well as his individual claims against Kaleida for damages, will survive regardless of the outcome of the instant motions to dismiss.

Medical providers and diagnostic labs often estimate a patient's GFR through an algorithm that measures levels of serum creatinine in the bloodstream and also considers other individual factors (the "eGFR"). (*Id.* at ¶ 5, ¶ 6) Some eGFR formulas consider a patient's race. (*Id.* at ¶ 6) Specifically, these formulas apply a multiplier to the GFR of a Black patient (the "race-multiplier"). (*Id.*) When the race-multiplier is used, a Black patient's eGFR will register several points higher than a non-Black patient's eGFR, despite the fact that both patients have the same amount of serum creatinine in their blood. (*Id.*) As a result, the Black patient's kidney function appears healthier. (*Id.*) The race-multiplier is based on the false assumption that, on average, Black individuals have greater muscle mass that non-Black individuals. (*Id.* at ¶ 7)

Patients with kidney disease are not considered for a kidney transplant until their eGFR falls below a certain numeric threshold. (*Id.* at ¶ 9) Because the race-multiplier artificially inflates a Black patient's eGFR, its use results in Black patients waiting longer for kidney transplants and other treatments. (*Id.*) Further, eGFR formulas which use the race-multiplier distinguish only between Black and non-Black individuals, and do not account for biracial or multiracial individuals. (*Id.* at ¶ 8) The National Kidney Foundation and the American Society of Nephrology has renounced the use of the race-multiplier in assessing patients' eGFR. (*Id.* at ¶¶ 13-14)

*Jordan Crowley's Kidney Disease and Treatment*

Jordan Crowley is a 22 year-old biracial male, specifically he is both Caucasian and Black. (*Id.* at ¶ 1) Crowley was born with a single shrunken kidney, and, as a result, has experienced regular loss of kidney function and kidney disease throughout his life. (*Id.* at ¶ 1, ¶ 17) He has regularly sought in-patient and out-patient care for his kidney

problems from the pediatric nephrologist at Kaleida as well as from the pediatric urology and transplant team at Strong. (*Id.* at ¶ 17) Since plaintiff was 15 years old, he has been advised by doctors, including his pediatric nephrologist and the Strong transplant team, that a kidney transplant is his best course of treatment. (*Id.* at ¶ 18, ¶ 20)

Kaleida has no policy for the collection of race data from biracial or multiracial patients. (*Id.* at ¶ 50) Kaleida's "patient face-sheets," which are found on the first page of a patient's chart, only indicate a single race and do not have categories to indicate that a patient is biracial or multiracial. (*Id.* at ¶ 49) In addition, Kaleida was aware that its registrar staff sometimes collected race and ethnicity information by observing the patient and guessing their race or ethnicity, rather than by giving the patient an opportunity to self-identify, and that this resulted in mistakes in the collection of such data. (*Id.* at ¶ 48) Crowley identified himself as mixed race when seeking care at both Kaleida and Strong. (*Id.* at ¶¶ 15-16) However, according to Crowley, Kaleida perceived him as Black and categorized him as such in their medical records system, without asking him to provide his racial identification. (*Id.* at ¶ 26)

Crowley's kidney function significantly declined in the summer of 2016. (*Id.* at ¶ 19) In 2017, Crowley met with the Strong transplant team to determine his eligibility for a kidney transplant. (*Id.*) Crowley was then informed that Strong had to characterize him as either Black or non-Black for purposes of a kidney assessment, and that Strong's "computer system was having trouble determining [his] status." (*Id.*) Strong used the race-multiplier formula when calculating a patient's eGFR. (*Id.* at ¶ 21)

Crowley underwent regular laboratory testing through his pediatric nephrologist's office and Kaleida, and those lab results were sent to Strong for use by the Strong

transplant team. (*Id.* at ¶¶ 24-25, n. 14) Kaleida, like Strong, used the race-multiplier formula when calculating a patient's eGFR. (*Id.* at ¶ 27) Because Kaleida classified Crowley as Black, Crowley's eGFR was calculated using the race-multiplier, resulting in a higher or artificially inflated score as to Crowley's kidney function. (*Id.*) Sometime between his initial evaluation and 2018, Crowley was deemed eligible for a kidney transplant and placed on the active waitlist for a kidney. (*Id.* at ¶ 23) However, on or about October 5, 2018, Crowley was removed from the active transplant list because his eGFR scores were too high, indicating that his kidney function was stable. (*Id.* at ¶ 24)

Between January 25, 2019 and February 2, 2019, Crowley was hospitalized at Oishei Children's Hospital, a Kaleida-owned facility, due to a urinary tract infection. (*Id.* at ¶ 28) During this time, his eGFR, calculated using the race-multiplier, fell to 20. (*Id.* at ¶ 29) Crowley's mother requested that Kaleida send notification to Strong, asking that Crowley be considered for a kidney transplant. (*Id.* at ¶ 29) Kaleida's emergency department staff are responsible for reviewing all relevant laboratory results to determine the appropriate follow-up care by notifying other health care providers as to those results. (*Id.* at ¶ 30) Thus, the use of the race-multiplier by Kaleida's emergency room service providers impacts a patient's follow-up care after they leave the emergency room. (*Id.*)

During a transplant evaluation at Strong in March of 2019, Crowley's mother and grandmother expressed their concern over use of the race-multiplier in calculating Crowley's eGFR, and its potential negative effect on Crowley's eligibility for a kidney transplant. (*Id.* at ¶ 31) Their concerns were ignored and went unaddressed. (*Id.*)

Beginning in 2019, Crowley was repeatedly taken on and off the active transplant list at Strong depending on the fluctuation of his eGFR score, which was calculated, by

defendants, using the race-multiplier. (*Id.* at ¶¶ 27, 32) This caused delays to the transplant process and limited Crowley's opportunities to find a prospective donor. (*Id.* at ¶ 36) But for defendants' use of the race-multiplier in calculating his eGFR, Crowley would have remained on the active transplant list. (*Id.* at ¶ 37, ¶ 39) Crowley's extended time on and off the list caused him physical harm, such as frequent UTI's and seizures. (*Id.*) In addition, Crowley missed an entire semester of school in 2019 due to deteriorating kidney health and frequent UTI's. (*Id.* at ¶ 39) He also suffered emotional harm. (*Id.*)

During their treatment of Crowley, defendants were made aware that eGFR scores calculated using the race-multiplier were not medically sound and that their continued use harmed non-Caucasian patients and patients perceived to be Black. (*Id.* at ¶ 33) However, they continued to use these formulas in treating Crowley and others. (*Id.*) Further, it was known to Kaleida, as early as 2004, that use of the race-multiplier in calculating eGFR scores did not accurately assess the kidney health of biracial and multiracial patients. (*Id.* at ¶ 34) Despite this knowledge, Kaleida continued to apply the race-multiplier until July 2022, resulting in purposeful discrimination against Crowley and others. (*Id.* at ¶ 39, ¶ 41, ¶ 48) In addition, more than 100 Black patients, or patients perceived to be Black, were subject to extended periods of time on and off the active transplant list as a result of Strong's use of eGFR scores calculated using the race-multiplier, and suffered harm as a result. (*Id.* at ¶ 44)

In March 2022, Strong began using a new eGFR formula that did not use the race-multiplier or otherwise take race into account in calculating a patient's eGFR. (*Id.* at ¶ 42) As a result of this policy change, Strong adjusted Crowley's eligibility date on the active transplant list to May 2017, representing the earliest time Crowley became eligible for a

kidney transplant. (*Id.* at ¶ 43) However, some of Crowley's medical records at Strong still do not reflect this change, resulting in confusion and mistakes in his ongoing medical care. (*Id.*)

Strong also began to adjust the wait times of more than 100 Black patients whose eGFR scores were previously calculated using the race-multiplier. (*Id.* at ¶ 45) The process for adjusting the waitlist times, which is time sensitive and affects the priority and eligibility of each person waiting for a transplant, is slow and "breeds inaccuracies." (*Id.*) The process requires Strong to obtain and review laboratory results from internal and external laboratories and "there is no clear way to obtain relevant records." (*Id.*) Strong has not hired a new staff person to oversee the adjustment. (*Id.*) In addition, Strong made and used "ad hoc" calculations of Crowley's eGFR scores throughout his care, based on the assumption that Black and biracial individuals are subject to a different eGFR formula. (*Id.* at ¶ 55) Thus, if Strong's change to a race-neutral eGFR formula is not correctly implemented and followed, Crowley will continue to suffer adverse consequences with regard to his case. (*Id.* at ¶¶ 55-56)  For example, it is foreseeable that even if Strong made facial changes eliminating the race-multiplier in eGFR scores, the prior scores, which incorporate the race-multiplier, can still skew the patients' "trend analysis." (*Id.* at ¶ 56) There are also remaining inconsistencies in patients' medical records which thwart diagnoses and medical treatment options. (*Id.*) Therefore, despite the policy change, patients who were previously assessed using the race-based eGFR continue to suffer ongoing harm. (*Id.* at ¶ 45 )

Kaleida stopped using the race-multiplier in calculating patients' eGFR scores in July of 2022. (*Id.* at ¶ 47) However, "gaps remain" in how eGFR levels are recorded and

compiled on a patient's electronic medical charts by Kaleida. (*Id.*) Such gaps have caused mistakes in Kaleida's "trend analysis," which "still compiles the eGFR scores in effect prior to the policy change." (*Id.*)

Crowley ultimately received a kidney transplant through Strong.[4] (*Id.* at ¶ 54) Crowley continues to receive post-kidney transplant care from Strong. (*Id.* at ¶¶ 52-53) To that end, he received UTI treatment in May of 2024; he sends monthly bloodwork to Strong; and he receives prescription medication from Strong. (*Id.*) Crowley has check-ups at Strong and will continue to have check-ups there into the future. (*Id.*) Crowley was anticipated to have a check-up at Strong in December of 2024, around two months after the filing of the AC. (*Id.*) In addition, Crowley is still a young adult. (*Id.* at ¶ 54) A transplanted kidney from a deceased donor lasts on average seven to nine years. (*Id.*) It is foreseeable that Crowley will need to seek a transplant in the coming years, and that he will return to Strong for evaluation, treatment, and waitlisting for a kidney. (*Id.* at ¶ 54) Thus, Crowley is still seeking treatment at Strong and will return to Strong in the future for continued kidney care and other related treatments. (*Id.* at ¶ 52)

Crowley resides in the greater Buffalo region. (*Id.* at ¶ 57) In the past, Crowley frequently sought care at Kaleida facilities including emergency treatment for a UTI, seizures, and other endocrinological health problems. (*Id.*) In light of the large number of Kaleida-owned hospitals and laboratories in Buffalo, it is likely that Cowley will "encounter medical care at Kaleida" through other physicians' referrals or based on the need for emergency care. (*Id.*) Because Kaleida still does not maintain policies for the collection

---

[4] The AC does not indicate the date on which Crowley received a transplant. However, papers submitted by the parties indicate that the transplant occurred in or around November of 2023, approximately two years after the commencement of this lawsuit. (Dkt. No. 115-1, pg. 7; Dkt. No. 116-1, pg. 5)

of racial data from biracial and multiracial patients, Crowley is likely to continue to experience harm when undergoing medical care at Kaleida. (*Id.* at ¶¶ 58-59)

Crowley alleges that defendants' racially discriminatory conduct violated (1) Title VI of the Civil Rights Act of 1964 ("Title VI"); (2) Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"); and (3) Section 290 of the New York State Human Rights Law (the "NYSHRL"). (*Id.* at ¶¶ 73-94) Crowley also alleges breach of contract based on defendants' respective Patient Bills of Rights. (*Id.* at ¶¶ 95-99)

Further, Crowley asserts the Title VI, ACA, and NYSHRL causes of action both individually and on behalf of certain putative classes, pursuant to Rule 23 of the Federal Rules of Civil Procedure. (*Id.* at ¶ 61) Crowley defines the classes as follows:

> Injunctive relief class against Strong Hospital: All individuals who have been previously assessed at Strong Hospital using the African American eGFR including Black, biracial, or multiracial individuals, or presumed to be of African American race.

> Damages class against Strong Hospital: All individuals who received a kidney assessment, evaluation, or treatment at Strong Hospital on or after October 1, 2017, whose wait times were adjusted based on the change in the eGFR formula after March 2022.

> Injunctive relief class against Kaleida Health: All individuals who are biracial or multiracial whose racial data was collected by Kaleida Health, had the race-based eGFR applied to their bloodwork by Kaleida, and had the race-based eGFR used by Kaleida or another medical provider for evaluation as to a kidney transplant recalculated due to use of the race-based eGFR.

(*Id.*)

Crowley alleges that he is a member of the classes he seeks to represent; that there are hundreds of potential class members; and that joinder is impractical based on the burden of filing individual lawsuits. (*Id.* at ¶¶ 62-64) Crowley alleges that common questions of law and fact predominate as to all class members, and that he has a strong

personal interest in the outcome of this litigation.[5] (*Id.* at ¶¶ 65-67) Crowley alleges that he is a patient at both Kaleida and Strong and that he is impacted by their policies, procedures, and customs. (*Id.* at ¶ 68)

Crowley seeks compensatory damages on behalf of himself and class members against Strong Hospital, based on physical and emotional harm suffered when their wait-times for kidney transplants were wrongfully extended as a result of race-based eGFR score. (*Id.* at ¶ 60, ¶ 72, pgs. 25-30) Plaintiff seeks compensatory damages as to himself only against Kaleida, also based on the physical and emotional harm he suffered as a result of Kaleida's use of the race-multiplier as well as Kaleida's lack of a policy for the collection of racial data from biracial or multiracial individuals, and their impact on his extended wait-time for receipt of a kidney transplant.[6] (*Id.* at ¶ 60, pgs. 25-30)

Plaintiff also seeks an injunction on behalf of himself and the putative classes, requiring Strong and Kaleida to (1) treat plaintiff's renal health in a race-free manner; (2) remove the race-multiplier from any eGFR formula used by defendants and provide medical treatment absent discrimination based on race: (3) allow patients to voluntarily state their racial identity only when it is pertinent to monitoring; (4) form a committee to study medical algorithms that adversely affect Black, biracial, or multiracial individuals; (5) educate staff about potential discrimination based on such algorithms and train staff to communicate to patients regarding those algorithms and to obtain informed consent: (6) implement fair and accurate waitlist adjustments through allocation of proper

---

[5] Crowley also alleges that he will fairly and adequately represent the interests of the classes and that he has no known conflicts with any class members. (Dkt. No. 113, ¶¶ 65-67)

[6] As noted previously, plaintiff does not assert a class claim for damages against Kaleida. Plaintiff also seeks compensatory damages on behalf of himself against UBMD Pediatrics. (Dkt. No. 113, ¶ 60) As noted previously, plaintiff does not assert any class claim against UBMD Pediatrics.

resources to ensure that the changes are fair and accurate; and (7) create policies for accurately collecting race data for biracial and multiracial individuals. (*Id.* at pgs. 29-30)

## **LEGAL STANDARD**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A defendant's challenge for lack of Article III standing, at the motion to dismiss stage, is properly raised under Rule 12(b)(1) for lack of subject matter jurisdiction. *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 735 (2d Cir. 2017). Without subject matter jurisdiction, a district court "lacks the power to adjudicate the merits of [a] case or dismiss a case with prejudice." *Id.* at 735 (quotations omitted). Thus, "where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice." *Id.* (quotation omitted); *see also Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 106 (2d Cir. 2022).

A Rule 12(b)(1) motion may be either facial or fact-based. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When the motion is facial, *i.e.*, based solely on the allegations of the pleading including the complaint and any exhibits attached to it, the plaintiff has no evidentiary burden. *Id.* The district court's task is to determine whether the pleading "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id.* When a Rule 12(b)(1) motion is facial, the court "accept[s] as true all material [factual] allegations of the complaint, and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* at 56-57; *see also John*, 858 F.3d at 736 (ruling that district court erred in not drawing reasonable inferences in favor of plaintiff because challenge to standing was facial).

Alternatively, a defendant may make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the pleading. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001). "[I]f the [evidence] submitted [by the defendants] on a 12(b)(1) motion . . . reveal the existence of factual problems" in the assertion of jurisdiction, plaintiffs must present evidence controverting the alleged defects. *Carter*, 822 F.3d at 57. Thus, when a defendant makes a fact-based challenge to jurisdiction, the plaintiff "has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113). However, if a defendant's proffered evidence is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing, then plaintiff is entitled to rely on the allegations in the pleading. *Carter*, 822 F.3d at 57.

## DISCUSSION

### *Crowley has standing to pursue injunctive relief against Strong.*

Article III restricts federal courts to the resolution of cases or controversies. *Davis v. Federal Election Comm.*, 554 U.S. 724, 732-33 (2008). That restriction requires a plaintiff to have a personal interest in the lawsuit that exists at the commencement of litigation. *Id.* at 732-33. And that personal interest or "actual controversy" must "persist throughout all stages of the litigation." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019). To establish standing, a plaintiff must show an "injury in fact," namely the invasion of "legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 506-61 (1992). Second, there must be a "causal connection between the injury and the conduct complained of." *Id.* Finally, it must be "likely, as opposed to merely

speculative, that the injury will be addressed by a favorable decision" by the court. *Id.* A plaintiff cannot "rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003).

In order to establish standing for purposes of obtaining injunctive relief, there must be an indication of "a continuing violation or the imminence of a future violation." *Wand v. Tesla*, 338 F.R.D. 428, 440 (E.D.N.Y. 2021) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998). To that end, the Supreme Court has explained that "a person exposed to risk of future harm may pursue forward-looking injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion v. Ramirez*, 594 U.S. 413, 435 (2021). A plaintiff seeking injunctive relief must also prove "that the identified injury in fact presents a 'real and immediate threat of repeated injury.'" *Kriesler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)).

Crowley's putative class claims for injunctive relief demand, *inter alia*, that Strong and Kaleida treat and assess his renal health in a race-free manner, remove the race-multiplier from the eGFR formula in all of their facilities and labs, and implement wait list adjustments for transplants through the allocation of proper resources to ensure that all waitlist adjustments are fair and accurate. Strong argues that Crowley lacks a personal interest in the requested injunctive relief sufficient to confer standing.[7] Strong contends that Crowley lacks standing because (1) Crowley's waitlist time was adjusted and he

---

[7] Where, prior to class certification, a named plaintiff seeking an injunction fails to allege a likelihood of future harm sufficient for standing, the named plaintiff cannot bring suit for a class. *O'Shea v. Littleton*, 414 U.S. 488, 493-95 (1974). Thus, if Crowley himself lacks standing to bring injunction relief claims against Strong, he cannot proceed with a putative class action claim against Strong for injunctive relief.

received a kidney transplant in November 2023 and (2) Strong no longer uses the race-multiplier in calculating eGFR scores or assessing eligibility for kidney transplants.

First, the fact that Strong adjusted Crowley's waitlist time and provided him with a kidney transplant in November of 2023 is not a bar to his standing. Crowley alleges that, since the transplant, he continues to receive renal and post-kidney transplant care from Strong, including treatment for a UTI in May of 2024. Crowley alleges that he sends monthly bloodwork to Strong, that he receives prescription medication from Strong, that he undergoes regular check-ups at Strong, and that he will continue to have check-ups there in the future. Indeed, Crowley was anticipated to have a check-up at Strong approximately two months after the date of the filing of the amended complaint. Crowley also alleges that because a kidney transplant typically lasts seven to nine years, it is foreseeable that he will need another kidney transplant in the future, and that he will return to Strong for evaluation and waitlisting for another transplant.

Thus, should Strong continue to discriminate against Black and biracial patients in providing renal care and making transplant decisions, such discrimination is imminently likely to have a substantial adverse effect on Crowley. The alleged discriminatory conduct also poses a real and repeated threat of future injury to Crowley. *See Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 415 (S.D.N.Y. 2012) ("[O]ne does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough.") *Baur*, 352 F.3d at 633-35, 640-42 (holding that plaintiff has standing to seek injunction to stop defendants from butchering non-ambulatory cows because of plaintiff's enhanced risk of mad cow disease as a consumer of beef); *LeFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (concluding

15

that likelihood of exposure to additional sulfur dioxide emissions qualified as injury-in-fact).[8]

A much closer question exists as to whether Crowley lacks standing because Strong no longer utilizes the race-multiplier in determining patients' eGFR scores and their eligibility for kidney transplants. Indeed, the AC acknowledges that, in March of 2022, Strong began using a new eGFR formula that does not use the race-multiplier or otherwise take race into account when determining a patient's kidney function. The AC further alleges that after the policy change, Strong began adjusting the waitlist times for all kidney transplant patients previously impacted by the race-multiplier. However, Crowley also alleges that Strong has not successfully and correctly implemented its new race-neutral policy for assessing patients' eGFR scores. Crowley alleges that the adjustment of wait-times for those patients previously subject to the race-multiplier has been slow and inaccurate, subjecting Black and biracial patients to continuing discrimination in kidney care. He alleges that Strong has not hired a staff member to

---

[8] Strong argues that Crowley's anticipated need for another kidney transplant sometime in the future is too speculative to confer standing. But Crowley is not relying solely on his need for future care. Here, Crowley alleges that he is both a current patient at Strong undergoing regular renal care and that he is likely to seek another kidney transplant there in the future. Moreover, Crowley's allegations as to the likelihood of his need to seek a kidney transplant at Strong is based on his specific medical history, his prior extended treatment through Strong, and medical evidence as to the viability of transplanted kidneys. Strong have not offered any factual evidence showing either that Crowley is no longer a patient at Strong or that he is unlikely to need another kidney transplant in the foreseeable future. Moreover, the Court finds Crowley's allegations distinguishable from those in the cases cited by Strong, where claims for injunctive relief against a hospital prohibiting certain forms of discrimination were dismissed for lack of standing because the plaintiff failed to sufficiently allege that they were likely to return to the hospital in question for treatment in the future. *See Freydel v. New York Hosp.*, 97 Civ. 7926, 2000 U.S. Dist. LEXIS 9 (S.D.N.Y. Jan. 4, 2000) (injunctive relief claims dismissed for lack of standing where plaintiff visited defendant hospital once and did not provide evidence of a likely future visit); *Ortiz v. Westchester Med. Ctr. Health Care Corp.*, 15 Civ. 5432, 2016 U.S. Dist. LEXIS 161777 (S.D.N.Y. Nov. 8, 2016) (plaintiff patient who was involuntary transferred to defendant hospital on one occasion and did not allege an intent to return lacked standing to bring claim for injunctive relief); *Schroedel v. New York Univ. Medical Ctr.*, 885 F. Supp. 594 (S.D.N.Y. 1995) (plaintiff filed to show real and immediate threat of repeated injury where, *inter alia*, she did not allege that she regularly utilizes the services of the hospital for any specific medical condition).

oversee the necessary changes and that both he and other class members continue to be adversely affected by the prior race-based policy and the manner in which transplant decisions are made. These allegations, considered in their totality, suggest that ongoing problems continue to exist in Strong's implementation and use of the race-neutral eGFR and that these problems will continue to affect Crowley in regard to his treatment at Strong.

Strong counters that Crowley's allegations of continuing harm are speculative. Strong argues that Crowley offers no specific facts as to how the hospital is continuing to use his prior race-based eGFR scores in administering treatment, nor does Crowley specifically allege how the race-multiplier's prior use impacts his current treatment now that he has received a transplant. To be sure, the allegations in the AC lack detailed examples as to Strong's continued use of either the race-multiplier or the prior race-based eGFR scores in Crowley's care. As a result, the finding of standing here is, certainly, a close call. But Crowley's allegations, considered in their totality, suggest that some of his medical records do not reflect the change and/or recalculation of his waitlist date, resulting in confusion and ongoing mistakes in his medical care. Crowley also alleges that there have been problems and inaccuracies in implementing the change to a race-neutral eGFR score in general, and that such issues are likely to "skew" his and other patients trend analysis as well as negatively impact diagnosis and medical treatment options. Stated another way, Crowley has alleged that Strong has not fully and correctly implemented the race-neutral eGFR policy, and that its failure to do so exposes him to imminent and substantial future harm in regard to his future medical care. While Crowley will need to present credible and specific evidence as to the truth of these allegations in

order to untimely succeed on his claims for injunctive relief, they are minimally sufficient, at the motion to dismiss stage, to establish standing.

As noted above, the Court can consider evidence outside the pleadings in a fact-based challenge to subject matter jurisdiction. To that end, Strong submits policy statements from United Network for Organ Sharing ("UNOS") and Organ Procurement and Transplantation Network ("OPTN") which state that if a person who previously received a kidney transplant returns to the waiting list, waiting time will be based only on the dates of the most recent kidney transplant.[9] (Dkt. No. 115, pg. 12) Thus, according to Strong, in the event Crowley needed another kidney transplant, Strong would not rely on any test results that included a race-based eGFR. But these policy statements, from other institutions, do not address Crowley's allegations that Strong's own records do not consistently reflect the new, race-neutral eGFR scores and waitlist dates, and that these mistakes will continue to affect the care he is receiving at Strong, both generally and in regard to future transplant eligibility.[10]

As noted above, where proffered evidence by a defendant does not contradict plausible allegations sufficient to show standing, a plaintiff is entitled to rely on the allegations in the complaint. It may well be the case that Crowley cannot ultimately succeed on his claims for injunctive relief, either based on lack of standing or for some other reason. But on balance, the Court finds the issue should proceed to the dispositive

---

[9] During oral argument on the motions to dismiss, counsel for Strong indicated that if Strong does not follow UNOS and OPTN policies, the hospital will lose its accreditation and/or ability to perform organ transplants.

[10] The Court also notes that the UNOS and OPTN policies relied on by Strong indicate that waiting time for a kidney recipient who returns to the kidney waiting list will be based only on the dates after *the most recent kidney transplant*. Here, Crowley alleges that the date of his most recent transplant was delayed as a result of Strong's unlawful and discriminatory use of a race-based eGFR. Thus, it is unclear how a waitlist policy which depends on the date of the allegedly delayed transplant would conclusively prove that Crowley is not at risk of future harm as a result of continued discrimination by Strong.

motion stage, together with Crowley's claims for damages, in order for both parties to fully present all relevant evidence.

Moreover, the allegations here are distinguishable from the cases cited by Strong, where courts dismissed injunctive relief claims regarding a defendant's use of a race-based eGFR in determining transplant eligibility. In *Randall v. United Network for Organ Sharing (UNOS)*, 720 F. Supp.3d 864 (C.D. Cal. 2024), plaintiff brough a class-action lawsuit claiming that defendants' use of a race-based eGFR to assess kidney function caused him and other class members delay in receiving kidney transplants and other negative health consequences. The court dismissed the injunctive relief claims as moot, finding that plaintiff, who had received a transplant, did not "allege that he [was] likely to require an additional kidney transplant at any point in the future, or that [defendants'] policies regarding how kidney transplant recipients are chosen will otherwise affect [him] in any way now that he had received a kidney." *Id.*[11] Differently here, Crowley alleges both that he is likely to seek a kidney transplant from Strong in the future, and that Strong's problems in implementing the race-neutral policy will continue to impact his ongoing medical treatment.

In *Robinson v. Fed. Bureau of Prisons (BOP)*, 22-1098, 2023 U.S. Dist. LEXIS 120813 (D.D.C. July 13, 2023), two Black inmates alleged that the BOP's use of a race-based eGFR to treat kidney disease subjected them to medical injuries and resulted in the denial of their compassionate release. The court dismissed plaintiffs' injunctive relief claims for lack of standing because the BOP had adopted a race-neutral formula for

---

[11] The dismissal was without prejudice, and the court noted that it was "possible that further allegations could establish that Randall or another plaintiff [had] some stake in the litigation." *Randall*, 720 F. Supp at 876.

assessing inmate's kidney function. But the Court permitted the filing of an amended complaint, acknowledging that plaintiffs could achieve standing by demonstrating that the BOP's use of the race-multiplier in assessing eGFR scores continued to affect them in some way, such as by showing that BOP did not actually change its policy. Here, for the reasons just stated, the Court finds that Crowley has sufficiently alleged, and Strong has not conclusively disproven, that problems in Strong's implementation of the new race-neutral eGFR policy continue to impact him. *See also Rowe v. Univ. of S. Cal.*, 2:24-CV-05022, 2024 U.S. Dist. LEXIS 233456 (C.D. Cal. Dec. 23, 2024) (dismissing injunctive relief claims from lawsuit alleging that defendants applied a racially discriminatory co-efficient to eGFR scores of black patients, because plaintiff has stopped receiving medical treatment from one of the defendants years prior and the other defendant terminated use of race-based co-efficient).

For these reasons, the Court finds that the injunctive relief claims against Strong should be permitted to proceed. Crowley will need to present credible evidence to support his allegations of standing at the dispositive motion stage, otherwise his claims for injunctive relief against Strong are likely subject to dismissal.[12]

*The injunctive relief claims against Strong are not moot.*

A case becomes moot, and therefore no longer a "case" or "controversy" for purposes of Article III, when the issues presented are no longer "live" or "the parties lack a legally cognizable interest in the outcome." *Already LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). "Mootness can arise in many

---

[12] Strong also argues that Crowley's request for declaratory relief should be dismissed because Crowley alleges only past injury. (Dkt. No. 115-1, pgs. 18-19) Because the Court finds that Crowley has standing to proceed against Strong for injunctive relief, his request for declaratory relief should not be dismissed at this time.

ways during the course of litigation." *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 94 (2d Cir. 2007). However, "[t]he mootness doctrine is riddled with exceptions." *Pinkhasov v. Vernikov*, 23-CV-3460, 2024 U.S. Dist. LEXIS 87774 (quoting *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994).

Strong contends that the hospital's transition to a new, race-neutral eGFR formula and its recalculation of wait times for patients impacted by the previous race-based eGFR renders the class claim moot. Strong notes that while the AC alleges that the hospital is "in the process of" adjusting wait times for transplant patients affected by the race-multiplier, the "indisputable evidence" shows that Strong completed the recalculation process on November 11, 2023. (Dkt. No. 115-1, pgs. 14-15) Strong submits a "NYFL Attestation Documentation," wherein Strong's Medical Director for the Kidney-Pancreas Transplant Program affirms that Strong completed the process of adjusting the waitlist time for all patients whose eGFR scores were impacted by the race-multiplier. (Dkt. No. 92-8) But Crowley alleges that this process was done incorrectly or inaccurately, not that it failed to occur.

Strong counters that Crowley should be able to point to specific inaccuracies in the recalculation process now, in order to proceed with his class-wide injunctive relief claim. Indeed, the Court acknowledges that the AC does not provide detailed examples of issues or problems with the recalculation process. However, at the time Crowley filed his motion to amend the complaint to add a putative class action, both parties acknowledged that additional discovery would need to be conducted as to the class claims. Thus, the Court finds, on balance and even though this is again a close call, that Crowley should be permitted to complete class-wide discovery rather than subject his claims to dismissal at

the pleadings stage. *See Alliance of American Insurers v. Cuomo*, 854 F.2d 591 (2d Cir. 1988) ("Before dismissing a case for want of jurisdiction, a court should permit the party seeking the court's intervention to engage in discovery of facts supporting jurisdiction."); *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) ("[C]ourts generally require that plaintiff be given an opportunity to conduct discovery on [] jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party."). Crowley will have to produce competent evidence, at the summary judgment stage, showing that there were inaccuracies or problems in the waitlist adjustments for class members, or that class members are otherwise continuing to suffer negative effects based on Kaleida's failure to correctly implement the race-neutral eGFR policy. Otherwise his injunctive relief claims are likely to be dismissed as moot.

Moreover, "[i]t is well settled that the voluntary cessation of allegedly unlawful conduct does not moot a case in which the legality of that conduct is challenged." *Christian Legal Soc. Chapter of the Univ. of California. v. Martinez*, 561 U.S. 661, 724 n.3 (2010). Stated another way, a defendant cannot automatically moot a case by simply ending its unlawful conduct when sued. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.*; *see also Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 395 (2d Cir. 2022) ("Generally, the voluntary cessation of allegedly illegal conduct is not enough to render a case moot. Otherwise, a defendant might strategically alter its conduct in order to prevent or undo a ruling adverse to its interest.") (internal citations and quotations omitted).

22

A defendant claiming that its voluntary compliance moots a case must show that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) (quoting *Granite State Outdoor Adver., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002). The defendant must prove "that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Mhany Mgmt.*, 819 F.3d at 603-04 (accord *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2000) (emphasis added). This is both a stringent, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982), and formidable burden, *Laidlaw*, 528 U.S. at 190.

Strong claims that the policy changes and waitlist adjustments have "completely and irrevocable eradicated the future effects" of any alleged discriminatory conduct which might be addressed by Crowley's request for class wide injunctive relief. But the AC alleges that Strong has failed to fully and correctly implement this new policy, such that adjustments of wait times for those patients previously subject to the race-based eGFR has been inaccurate. The AC alleges that Strong failed to hire a staff member to oversee the necessary changes, and that class members continue to be adversely affected by the appearance of prior, race-based eGFR scores in their records and the way in which transplant decisions are made. Indeed, the Court has already found these allegations sufficient to overcome mootness at the pleadings stage. (Dkt. No. 112, pgs. 27-28) (rejecting Strong's argument that the motion to amend the complaint to include class-wide injunctive claims should be dismissed because the relief requested was moot).

Strong also argues that the voluntary cessation doctrine warrants dismissal of the injunctive relief claims because there is no reasonable expectation that the use of a race-based eGFR score in its treatment of kidney disease will reoccur. *See Robinson*, 2023 U.S. Dist. LEXIS 120813, at *15 ("[T]he mere power to reenact a challenged rule is not a sufficient basis on which a court can conclude that a reasonable expectation of reoccurrence exists absent evidence indicating that the challenged rule likely will be reenacted."). But the AC is not alleging only that Strong may revert back to the race-based eGFR. As noted above, the AC also alleges ongoing problems with Strong's implementation of the new race-neutral policy, and also alleges that class members continue to face discrimination in the course of their treatment.[13]

For these reasons and in light of the heavy burden faced by Strong in relying on its voluntary compliance, the Court finds that Crowley should have an opportunity to complete class-wide discovery before being required to provide more specific proof at the dispositive motion stage.

<u>*Crowley lacks standing to pursue injunctive relief against Kaleida*</u>.

As explained previously, a plaintiff seeking injunctive relief must show an injury in fact by demonstrating that a defendant's conduct is causing irreparable harm. *Schroedel v. New York Univ. Medical Ctr.*, 885 F. Supp. 594, 598 (S.D.N.Y. 1995). This requirement cannot be met absent a showing that the identified injury in fact presents a "real and

---

[13] Strong notes that UNOS and OPTN policies now prohibit all transplant centers, including Strong, from using a race-based eGFR formula in considering patient eligibility for a transplant. Strong also states that it could not have recalculated waitlist times for class members or provide Crowley with a kidney transplant until UNOS amended its policy to permit waitlist adjustments. Strong appears to use UNOS and OPTN policies as both a sword and a shield. And taken to its logical conclusion, Strong's arguments suggest that in the albeit unlikely event UNOS and OPTN return to the use of a race-based eGFR formula, Strong would have no choice but to do the same. It cannot be the case that Strong is permitted to engage in allegedly unlawful and discriminatory conduct because UNOS and OPTN forced its hands. Thus, the Court does not find Strong's reliance on UNOS and OPTN policies to be particularly persuasive here.

immediate threat of repeated injury." *Kreisler v. Second Avs. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (internal citations omitted).

Here, Crowley alleges that Kaleida has no policy for the collection of racial data from biracial or multiracial individuals. He alleges that Kaleida categorized him as Black in their medical records without asking him to provide his racial identity. As a result, Kaleida applied the race-multiplier to Crowley's eGFR scores when conducting laboratory testing of his bloodwork, which when used by Strong to assess eligibility for a kidney transplant, extended Crowley's time on the waitlist and delayed his receipt of a transplant. Crowley alleges that even though Kaleida no longer applies the race-multiplier to any patient's eGFR scores, "gaps remain" in how eGFR levels are recorded on patient's medical charts. Crowley further alleges that Kaleida still does not maintain policies for the collection of racial data from biracial and multiracial patients, resulting in continued discrimination against putative class members.

Even assuming all this to be true, Crowley lacks standing to seek injunctive relief against Kaleida because the AC fails to show a "real or immediate threat" that he will be harmed by Kaleida's conduct. More specifically, the allegations in the AC do not show a substantial likelihood that, in the foreseeable future, Crowley will return to Kaleida for either bloodwork related to his kidney function, or medical care in general.

Unlike his allegations pertaining to Strong, Crowley does not allege that he is currently seeking treatment at a Kaleida-owned healthcare facility or that he has an ongoing treatment relationship with a Kaleida-owned facility or provider. Instead, Crowley alleges that he resides in Buffalo, that he frequently sought treatment at Kaleida in the past, and that he is likely to "encounter" treatment there in the future through referrals by

other providers or the need for emergency care.[14] In *Harty v. Greenwich Hospital Group*, 428 Fed. Appx. 69 (2d Cir. 2011), the Second Circuit concluded that a plaintiff who "avow[ed] a present intent to return" to a particular location had standing to seek injunctive relief as to his discrimination claim. However, a plaintiff who "could" or might be referred to a particular hospital in the future, "the likelihood of which was contingent upon events whose occurrence was speculative and beyond her control, *i.e.*, her future health care needs and her being referred to [defendant]," alleged indefinite future harm insufficient to maintain standing to seek injunctive relief. *Id.*

Likewise here, Crowley's allegations that he may be referred to Kaleida for medical treatment or emergency care in the future are too speculative and indefinite to confer standing. *See also Freydel*, 2000 U.S. Dist. LEXIS 9, *7 (allegations of a chronic heart condition and the potential for a referral to the defendant hospital were insufficient to establish standing for claims of injunctive relief); *Ortiz v. Westchester Med. Ctr. Health Care Corp.*, 15 Civ. 532, 2016 U.S. Dist. LEXIS 161777 (S.D.N.Y. Nov. 18, 2016) ("In order to establish a real and immediate threat of future harm required for standing purposes…[p]laintiffs would need to allege that a referral or emergency transport to [d]efendant [hospital] was actually likely, not merely possible[.]").

And while Crowley alleges that he previously utilized Kaleida-owned facilities to undergo bloodwork, Crowley does not allege that he intends to return to Kaleida for bloodwork related to his kidney function, or for any other type of bloodwork. Indeed, Crowley fails to allege that he actually intends to return to Kaleida for any type of medical

---

[14] The AC contains one general statement that Crowley is a "patient at Kaleida." (Dkt. No. 113, ¶ 68) But none of Crowley's allegations support a finding that he is a *current* patient at any Kaleida-owned facility. Instead, the allegations in the AC allege only that Crowley has received medical care or services from Kaleida in the past.

care at all. *See Mark-Ellis v. NYU Langone Health Sys.*, 23 Civ. 9618, 2025 U.S. Dist. LEXIS 122835 (S.D.N.Y. June 27, 2025) ("Without allegations substantiating his intent to return to the [h]ospital, [p]laintiff lacks standing to seek injunctive relief."); *Naiman v. New York Univ.*, 95 Civ. 6469, 1997 U.S. Dist. LEXIS 6616, at *14 (S.D.N.Y. May 12, 1997) (allegations that a patient visited defendant medical center four times in the past did not show sufficient likelihood of future harm to establish standing absent a demonstrating that plaintiff "will require the services of the [defendant hospital] in the future").

Moreover, Crowley has not established that he faces a real and immediate threat of repeated or continued injury based on Kaleida's ongoing conduct. It is undisputed that Kaleida no longer applies the race-multiplier when measuring any patient's eGFR. Thus, even assuming that Kaleida has no policy for the collection of racial data from biracial or multiracial individuals, and even assuming that Kaleida continued to wrongfully categorize Crowley as Black, any future eGFR score generated by Kaleida, as to Crowley, would not apply the race-multiplier. Stated another way, even if Crowley were to undergo bloodwork at a Kaleida-owned facility sometime in the future, Kaleida would utilize a race-neutral eGFR formula, and thus no racial data would be considered in the resulting test.

Even though both Kaleida and Strong have ceased using the race-based eGFR, Crowley's allegations of future harm by Kaleida are markedly different than those asserted against Strong. Crowley alleges an ongoing treatment relationship with Strong in regard to his renal care as a whole. He also alleges that mistakes and inaccuracies in Strong's implementation of a race-neutral eGFR policy will continue to impact the care he receives at Strong in the future, including the value of trend analysis, his medical diagnoses, and his eligibility for another kidney transplant. By contrast, it is undisputed that Kaleida

neither performs kidney transplants nor determines a patient's eligibility for a kidney transplant. Crowley does not allege an ongoing treatment relationship with Kaleida. Unlike Strong, Crowley does not specifically allege that Kaleida will continue to diagnose and determine the course of his renal care in the future. Instead, the AC alleges only that Kaleida is responsible for conducting bloodwork that Strong and other providers rely on for purposes of making medical decisions, including determining the eligibility of Crowley and other class members for a kidney transplant. And now any future blood tests taken by a Kaleida-owned facility, should Crowley ever visit them in the future, will not incorporate the race-multiplier.

Crowley alleges that even though Kaleida now uses a race-neutral eGFR formula, "gaps remain" as to how eGFR levels are compiled on a patient's electronic medical records generated by Kaleida, thwarting the value of "trend analysis." But Crowley does not allege how such "gaps" would cause him "a real and immediate threat of repeated future injury" by Kaleida, as necessary to justify injunctive relief. According to the allegations in the AC, Kaleida's role in Crowley's transplant-related care was limited to blood testing. There are no allegations to suggest that, in the foreseeable future, Kaleida is likely to use *prior* records containing the race-based eGFR to make medical decisions impacting Crowley's future transplant eligibly, or even his kidney care in general. And even construing the allegations in Crowley's favor, it is too speculative to infer that, going forward, Kaleida will provide Crowley's *prior*, race-based eGFR scores to Strong, or any other medical provider, or that those prior scores provided by Kaleida will be used, in

the future, to determine Crowley's eligibility for another kidney transplant.[15]

While Crowley's allegations of past discrimination by Kaleida in regard to his prior medical care sufficiently confer standing to seek compensatory damages as to his individual claims, Crowley has not allege that he "is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016). And where a named plaintiff seeking an injunction fails to allege a likelihood of future harm sufficient for standing, the named plaintiff cannot bring suit on behalf of the class. *O'Shea*, 414 U.S. at 493-95. For these reasons, the Court finds that Crowley's putative class claims for injunctive relief against Kaleida should be dismissed for lack of standing.[16]

### *Crowley's Request for Discovery*

On January 24, 2025, counsel for plaintiff wrote a letter to the Court indicating that Strong and Kaleida have refused to engage in discovery as to the putative class claims, in light of the pending motions to dismiss. (Dkt. No. 128) In the event that the District Court adopts the recommendations herein, Strong is ordered to engage in discovery regarding Crowley's putative class claims for damages and injunctive relief. The parties shall jointly submit a proposed amended scheduling order, and shall include a date for the filing of a motion for class certification. Also in light of the recommendations herein, plaintiff's request to engage in class discovery as to Kaleida is denied as moot.

---

[15] The AC alleges that Crowley was hospitalized at Oishei Children's Hospital for a urinary tract infection between January 25, 2019 and February 2, 2019. Crowley alleges that because Kaleida's emergency department staff are responsible for reviewing laboratory results to determine follow-up care, the use of a race-based eGFR score in the emergency department impacts a patient's follow-up care. While these allegations are relevant to past injury, they do not show potential future harm. It is undisputed that if Crowley were to visit Oishei Children's Hospital or another Kaleida-owned facility in the future, no race-multiplier would be applied to his eGFR score.

[16] Because declaratory relief is only available for future injury, *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021), Crowley's requests for a declaratory judgment against Kaleida should also be denied. *See Tang Cap. Partners, L.P. v. BRC Inc.*, 22-CV-3476, 2023 WL 2396635, *20 (S.D.N.Y. Mar. 8, 2023) ("declaratory judgments resolving disputes over past acts are inappropriate").

## CONCLUSION

For the foregoing reasons, it is recommended that Strong Memorial Hospital of the University of Rochester's motion to dismiss the putative class action claims for injunctive relief be denied (Dkt. No. 115) and that Kaleida Health's motion to dismiss the putative class action claims for injunctive relief be granted (Dkt. No. 116). It ordered that Crowley's motion for discovery is granted in part and denied in part. (Dkt. No. 128).

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to the recommendations portions of the Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72.  Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.***  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

Dated:       August 12, 2025
             Buffalo, New York

MICHAEL J. ROEMER
United States Magistrate Judge